**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **JAMES E. RODGERS,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DR. PERCY MEYER, DR. REYNAL CALDWELL, DR. ARVINDER ARORA, DR. STEPHEN WHEALON, WEXFORD HEALTH SOURCES, INC., CENTURION OF ILLINOIS LLC, and WARDEN JEFFREY WEHKING (OFFICIAL CAPACITY ONLY),[1]**<br><br>**Defendants.** | **Case No. 26-cv-880-NJR** |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff James E. Rodgers, an inmate of the Illinois Department of Corrections who is currently incarcerated at Centralia Correctional Center, brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. The matter is currently before the Court on Rodgers's motion for preliminary injunction (Doc. 6). Defendants Centurion of Illinois, LLC and Steve Whealon filed a response (Doc. 39) in opposition to the motion. Defendant Jeffrey Wehking has also filed a response (Doc. 40).[2]

---

[1] Centurion of Illinois LLC has now identified itself by its proper name. The Clerk of Court is **DIRECTED** to **CORRECT** the docket to reflect Defendant's proper name.

[2] Defendants Centurion and Stephen Whealon also filed a motion to seal Rodgers's medical records (Doc. 40). The Court notes, however, that medical records are generally not filed under seal, and Defendant Wehking did not seal the records attached to his response to the motion for preliminary injunction (Doc. 42-2). The Court sees no basis for sealing the documents filed by Centurion and Stephen Whealon, and thus the request to seal is **DENIED. T**he Court notes that exhibits 40-1 and 40-2 were never filed under seal, and the Court has considered the filings in place of the provisional exhibits.

## Background

On June 23, 2026, Rodgers filed a Complaint alleging deliberate indifference in the treatment of his cardiac condition and hernias (Doc. 1). Although Rodgers's request for relief included a request for a preliminary injunction, he failed to file a separate motion under Federal Rule of Civil Procedure 65(a). Nor did he demonstrate that he was entitled to injunctive relief, and thus his request for an injunction was denied (Doc. 4). Rodgers subsequently filed the pending motion for preliminary injunction seeking evaluation by a cardiologist who specializes in Rodgers's congenital heart defect (*Id*. at p. 5). He also seeks a cardiology appointment in order to obtain clearance for a surgical repair of his hernias (*Id*.).

After review of the Complaint, Rodgers was allowed to proceed on the following counts:

Count 1: Eighth Amendment deliberate indifference to medical needs claim against Dr. Meyer, Dr. Caldwell, Dr. Arora, and Dr. Whealon for failing to refer Rodgers to a cardiac specialist.

Count 2: Eighth Amendment deliberate indifference to medical needs claim against Dr. Meyer, Dr. Caldwell, Dr. Arora, and Dr. Whealon for delaying Rodgers's surgical treatment for his hernias.

Count 4: Eighth Amendment claim against Wexford Health Sources, Inc. and Centurion for having policies and practices that delayed Rodgers's access to medical care.

(Doc. 8, pp. 6-9).

Rodgers's Complaint alleged that he suffers from multiple congenital heart defects to include pulmonary atresia, ventricular septal defect, a double outlet right ventricle, and an aortic aneurysm (Doc. 8, p. 2). He received a pulmonary valve replacement in 2000, but the lifespan of the valve is only 20 years. Rodgers maintains that he is supposed to be evaluated

by a cardiologist who specializes in his conditions on a yearly basis. Despite this requirement, Defendants have only referred him to a local cardiologist who is not qualified to treat his particular defects (*Id*.). That cardiologist recommended Rodgers's care be transferred to a cardiologist who is qualified to treat Rodgers's specific conditions. Rodgers alleges that Defendants have refused to order a referral (*Id*.). As a result, Rodgers claims he has not received an adequate evaluation in over three years and has complained of frequent shortness of breath, fatigue, heart palpitations, and chest pains (Doc. 6, pp. 4-5).

Rodgers also suffers from dual inguinal hernias (Doc. 8, p. 3). He suffered for nearly a year before being referred to a surgeon for possible repair (*Id*.). Although the surgeon recommended surgery, the surgeon required that Rodgers receive clearance for the repair from his cardiologist and that the surgery take place at Barnes Jewish Hospital due to his heart defects (*Id*.). Rodgers alleges that Defendants refused to approve an appointment with his cardiologist, and he has not yet been scheduled for surgery as a result (*Id*. at p. 4).

In response, Defendants argue that Rodgers has been seen on many occasions for his conditions. They point to his medical records to demonstrate that Rodgers has received care for both his heart defects and his hernias.

Warden Jeffrey Wehking offered the affidavit of Registered Nurse and Healthcare Unit Administrator Brittany A. Sauter who reviewed Rodgers's medical records regarding his two conditions (Doc. 42-1). Defendants Centurian and Dr. Steve Whealon also offered copies of Rodgers's medical records (Doc. 40-1). The medical records show that Rodgers was seen by Dr. Walter Parham in 2023 and 2024 (Doc. 40-1, pp. 12, 15, 24, 27-28, 48, 53). He had an echocardiogram on March 10, 2023, and April 24, 2024 (*Id*. at pp. 16, 21, 23, 57). He had CT scans of his chest on March 28, 2023, and July 19, 2023 (*Id*. at pp. 29, 31-32, 42-43). Rodgers

was referred to Dr. Puja Kachroo for further evaluation, and on July 19, 2023, he met with Dr. Kachroo (*Id*. at pp. 37-39).

Also in July 2023, Rodgers was referred for a surgical evaluation for his bilateral inguinal hernias (Doc. 42-1, p. 1; Doc. 42-2, p. 87). Rodgers was referred for a CT of his abdomen and pelvis for an ascending aortic aneurysm as well as a congenital echocardiogram (Doc. 42-2, pp. 72, 78). On February 24, 2024, Rodgers was again referred to the doctor for his hernias (*Id*. at p. 197). The nurse noted that they were reducible when lying down but popped out when Rodgers got up (*Id*.). Both an ultrasound of the hernias and an echocardiogram were authorized by Wexford (*Id*. at pp. 63-64). In April and May, Rodgers had an echocardiogram and CT with contrast (*Id*. at pp. 65-70; 203-204). The CT scan noted a right inguinal hernia with small bowel loops (*Id*. at p. 79). On May 14, 2024, Rodgers received a CT angiogram (*Id*. at pp. 83-84, 105-106).

On June 13, 2024, Rodgers met with Dr. Erica Ibendahl regarding his hernias (Doc. 42-2, p. 88). Dr. Ibendahl recommended a surgical repair of the hernias, but given his cardiac history, she recommended that Dr. Kachroo evaluate his condition and possible risks prior to surgery (*Id*. at p. 103). She also noted that the repair should take place at Barnes-Jewish Hospital given Rodgers's medical conditions (*Id*.). On July 25, 2024, Rodgers was placed on the medline to discuss a referral for cardiac clearance of his hernia repair (*Id*. at p. 210). On August 1, 2024, he was seen by a doctor at Centralia regarding the referral (*Id*. at pp. 211-212). On September 24, 2024, Rodgers again saw Dr. Parham for a follow-up appointment and was recommended for a follow-up in one year (*Id*. at p. 215, Doc. 40-1, p. 78). At Centralia, the doctor prescribed several permits and a hernia belt (Doc. 42-2, p. 217).

On December 22, 2024, Rodgers met with a nurse complaining about his need for hernia repairs and his cardiac history (Doc. 42-2, p. 220). On January 8, 2025, the medical doctor at Centralia noted urgent medical needs including a referral for hernia surgery at Barnes and a referral for cardiac clearance for the surgery (*Id*. at p. 221). A notation indicates that a collegial had been completed twice (*Id*.). On August 12, 2025, he was again evaluated with a note that Rodgers would be referred to Dr. Kachroo for a follow-up; he was also referred for a hernia repair (*Id*. at p. 228). On September 24, 2025, Rodgers had a follow-up with Dr. Parham (*Id*. at p. 113). An echocardiogram was ordered, and Dr. Parham recommended a referral to a congenital heart specialist (*Id*.). On October 13, 2025, Rodgers had an echocardiogram (*Id*. at p. 235). Eight day later, Dr. Whealon referred Rodgers to Dr. Kachroo for cardiac approval of his hernia repair (*Id*. at p. 236). On November 4, 2025, Dr. Whealon again noted in the medical records that Rodgers was referred to Dr. Kachroo (*Id*. at p. 237). On November 26, 2025, Dr. Whealon ordered a 30-day monitor, a cardiac stress test, and TEE test as directed by Dr. Parham (*Id*. at pp. 151-153). On December 2, 2025, Dr. Whealon noted his plan to order the tests in Rodgers's medical records (*Id*. at p. 241). Andrew D. Walter, vice president of Centurion, stated in a declaration that as of March 7, 2026, Dr. Steven Whealon no longer provided medical care at the Illinois Department of Corrections (Doc. 39-1, p. 1).

Healthcare Unit Administrator Sauter stated in her declaration that the referrals previously issued by Dr. Whealon have now been expedited (Doc. 42-1, p. 3). On August 28, 2026, Rodgers had a stress test and was placed on a 14-day event monitor (*Id*.). Rodgers was scheduled for a transesophageal echocardiogram on September 4, 2026, and Dr. Parham would review the results of that test (*Id*.).

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" for which there must be a "clear showing" that a plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R Miller, & Mary Kay Kane, Federal Practice and Procedure §2948 (2d ed. 1995)). The purpose of such an injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). A plaintiff has the burden of demonstrating (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction. *Planned Parenthood v. Commissioner of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012).

As to the first hurdle, the Court must determine whether "plaintiff has any likelihood of success—in other words, a greater than negligible chance of winning." *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). Once a plaintiff has met his burden, the Court must weigh the balance of harm to the parties if the injunction is granted or denied and also evaluate the effect of an injunction on the public interest. *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success of the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte*, 735 F.3d at 665. In addition, the Prison Litigation Reform Act provides that a preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm . . . " and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Finally, pursuant to Federal Rule of Civil Procedure 65(d)(2), a preliminary injunction would bind only the parties, their officers or agents, or persons in active concert with the parties or their agents.

## DISCUSSION

Although Rodgers seeks immediate evaluations from a cardiologist for both his congenital heart defects and a surgical clearance for his hernias, Rodgers fails to demonstrate a likelihood of success on the merits of his claims. To succeed on an Eighth Amendment claim of deliberate indifference to medical needs, a plaintiff must demonstrate that he suffered from "an objectively serious medical condition" and that a "state official was deliberately… indifferent" to that condition. *See Giles v. Godinez*, 914 F. 3d 1040, 1049 (7th Cir. 2019). A plaintiff must show that the defendants' actions were more than negligent, something approaching intentional wrongdoing or recklessness. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

Rodgers claims that he has been denied medical care for his two conditions, but the medical records reflect that he has received medical care, including various tests and referrals to specialists for his heart condition. He previously saw Dr. Kachroo for his condition, as well as Dr. Parham. In order to obtain clearance for his hernia repair, Dr. Whealon referred Rodgers back to Dr. Kachroo and ordered several diagnostic tests. Those were ordered in November 2025 (Doc. 42-2, p. 237). Although there appears to have been some delay in scheduling those tests and follow-up, there is no indication that the delays were caused by the deliberate indifference of Dr. Whealon or any of the named defendants. Instead, it appears that Dr. Whealon sought to obtain the proper diagnostic testing and referrals necessary for Rodgers's surgery prior to Whealon's departure from IDOC (*Id*. at p. 236-37, 241). And Rodgers has now had some of the requested tests. In a recently filed motion to expedite discovery, Rodgers notes that on August 28, 2026, he had a stress test and was fitted for a 30-day heart monitor (Doc. 43, p. 5). Although Rodgers contends that the cardiologist

and nurse he saw for the tests did not specialize in his condition and he believes that the tests were ordered by the prison, the medical records indicate that the testing was ordered by Dr. Whealon based on instructions of Dr. Parham (*Id*. at p. 241). Dr. Whealon also noted that Rodgers would be referred to Dr. Kachroo for a follow-up (*Id*.). Because Rodgers appears to be receiving medical care, there is no evidence of deliberate indifference that would justify a preliminary injunction at this stage.

## CONCLUSION

For the reasons set forth above, Rodgers's motion for preliminary injunction (Doc. 6) is **DENIED**.

**IT IS SO ORDERED.**

**DATED: October 1, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**